Oral argument is not to exceed 30 minutes per side. Mr. Sweeney for the appellant. You may proceed. Thank you, Your Honor. To the police, the court, this is Tim Sweeney on behalf of Rommel Broom. If I could please reserve 5 minutes for rebuttal. Yes. On September 15, 2009, Ohio inflicted great pain and trauma and human suffering on Rommel Broom. The two hours of increasingly degrading and unreasonable and eventually lawless attempts to complete the state's death warrant that required his death that day. His suffering as that execution progressed was very substantial both in terms of his physical pain but also the very human trauma that he went on and on with no end in sight but his death that day. At times, as you know, he cried out in pain. He cried tears. He sobbed. That robust 53-year-old healthy man. His human dignity was extreme. Only after two hours was the execution stopped and he was told he had to return again the next week to go through it again. On these facts, this should be and in our view is an easy case. A straightforward application of both the Eighth and the Fifth Amendments as applied under modern standards, not those of the 1940s, bars the repeat attempt the state wants to undertake and it bars it by any means or any methods. Today I'd like to address the Eighth Amendment claim principally but either the Fifth or the Eighth Amendment or both entitle Mr. Broome to the relief he seeks. This of course is a habeas case so 2254 needs to be addressed and I want to do that first because his path to relief in habeas is of course smoother if there's no deference owed to the Ohio Supreme Court but in our view he's entitled to relief either way. In this case there is no deference owed though to the Ohio Supreme Court. That court did not reach a decision that under the controlling law should be treated as an adjudication on the merits or at the very least was an unreasonable determination of the facts in light of the evidence that had been presented in the state trial court. The principal problem with the Supreme Court of Ohio's decision is that it went outside the record to determine against Mr. Broome a method of execution standard that the court applied to him for the first time in that case. His case is not a method of execution case. Nonetheless the Ohio Supreme Court required him to prove a likelihood of severe pain would be suffered in the second execution if it went forward and that the state was likely to violate its protocol in the future. That's a method of execution standard which he isn't raising and hasn't been raising but the Supreme Court applied that standard to him for the first time in his case and then went outside the record to adjudicate that fact issue against him based upon evidence  That is a fundamental breakdown and extreme malfunction in the words of habeas law in the way the state Supreme Court addressed that claim which in our view disentitles it to be treated as an adjudication on the merits and should open Broome's claim to a habeas court to de novo review. We're aware certainly and the warden has argued Richter and some of these other cases which certainly are important cases and we're also aware of this court's decision in Ballinger and Loza and some of the others. But those courts stand for the proposition that when a limited state court record is what's been assembled in the state court the habeas petitioner isn't entitled once he gets into federal court to ask the federal court to look beyond that record. But that's not what happened here. This isn't a situation where Broome went into the federal court and asked Judge Boyko to look at all this evidence that I now want to present to you that wasn't in the state record. What happened here is that the state Supreme Court went outside that record and looked to evidence that Broome hadn't presented, never had a chance to confront, and which was principally reliant on a protocol that was ephemeral, tenuous and subject to change at any moment. Are you referring to the evidence regarding 21 executions that happened after the 2009 attempt? That's certainly part of it, correct, Your Honor. That's right. So could we simply discard that evidence if we thought that that was not appropriate to consider? Well, I don't think that would be right. It certainly would be appropriate to say it shouldn't have been considered. But I think the fact was that this was the way the Supreme Court of Ohio adjudicated the claim against him without giving him an opportunity to address any of that evidence. And so I don't know that we can put the case back in the posture it should have been in. And if you do discard that evidence, then it would seem to me Broome's case, without any question it would seem to us, based upon the record that had already been presented. Because the principal problem the Ohio Supreme Court committed, the error it committed here, is that it applied a standard requiring him to look to the future and assess risk, when that simply isn't the proper standard in his claim. So by looking to the future, as opposed to what had already happened, the state courts misapplied the law. And they unreasonably determined the facts. Which is why, Your Honors, in both state court appellate proceedings, there were such sharply divided decisions. In the first appellate proceeding in the 8th District Court of Appeals, it was 2-1 because there, the state appellate court erected a new standard, which it called you had to prove deliberate indifference in that court's view, erected that standard for Broome's claim, and then without giving him a chance to prove it, or even any notice that that was going to be the standard, decided that he couldn't prove it, and rejected his claim. When he got to the Ohio Supreme Court, the same type of thing happened. And again, there was a sharply divided court. There, the court said, no, deliberate indifference isn't the standard, but you do have to prove this in a future method of execution. Forward-looking problems with the state protocol, and whether it will expose you to risk in the future. And again, looked at evidence that wasn't in the record, looked at things at 21 executions, and other things that they drew from court opinions and other things that weren't in the record, and concluded that Broome could not meet that standard without giving him a chance to try, without giving him a chance to rebut or contradict or present additional evidence or different evidence that would meet the standard that the Supreme Court of Ohio said he was required to meet. In that circumstance, and you ended up with that 4-3 decision. Justice French concluding that this was clearly a problem, that it didn't give Broome an opportunity to be heard. That's a fundamental breakdown in the state court system. It's such an important sort of once-a-half-century type of claim, to be setting standards for the first time when the litigant arrives, and then relying on facts that he never has a chance to confront, to adjudicate that once-a-century claim against him, is just fundamentally wrong. And it opens up his claim to de novo review. And so if I could, I'd like to It's Julia Gibbons. Could I please ask you something? Absolutely, Your Honor. Okay. I guess one of the problems I have with this case is that you sought to characterize this case, you sought to characterize from the very beginning, the constitutional violation as being what occurred in the initial attempt to execute it. And you could characterize, arguably, what the Ohio Supreme Court did as going outside the record, or you could characterize it, perhaps, as saying, well, this is what Mr. Broome cannot stop at showing. It's not a constitutional violation if all he shows is what happened on the initial attempt, as bad as that was. It's a constitutional violation if there can be, he also may have to show some probability that that same sort of thing would occur again. And I don't know that I would characterize what the Ohio Supreme Court is doing as relying on evidence outside the record or more a commentary on just what more would have had to be shown. And it is true that Mr. Broome, at some point along the way, may have asked for an evidentiary hearing, but he didn't articulate any desire to show or to try to offer evidence on what the Ohio Supreme Court said was required. Is that a fair characterization of, I don't expect you to accept that that's a fair characterization of what the Ohio Supreme Court did, but I would like to know whether you think that's a fair characterization of Mr. Broome's position. Thank you for the question, Your Honor. I don't think that's a fair characterization. I really think, and we've been involved in this for many years, going back to the very beginning, I think the arguments have been that what happened to him already is sufficient to establish these constitutional violations. And even looking forward, you know, there's nothing to believe that it's going to be any different. He's got the same veins. That's always been our argument. He's got the same veins. You've got the same, you know, greatly competent medical paraprofessionals doing the IV access. You've got the same rough, you know, the same requirement of obtaining IV access through the peripheral veins. All of those things are going to be the same in the future. In fact, that was the truth, and that was correct. That was state of the record when Broome first it was only after, as you recall, right before the Byros execution, that the state of Ohio made a change. And they said in Broome, they said because of Broome, we're going to change, and we're going to get rid of the three drug protocol because of the stress it places in part on the importance of IV access, and we're going to introduce a backup method. And that was the method that was in place for these 20-some executions that the Ohio Supreme Court relied upon, a different method where IV access wasn't as important and when there was a backup. So, you know, what's happened since then, though, is that the state court doesn't have that method any longer. Now Broome is back in a situation where he's facing a worse protocol than the one he faced in 2009 because now the first drug is midazolam, which there's certainly evidence to suggest is not sufficient to do its job, and there's no backup. So he's back exactly where he was in 2009 facing the same problems again with the same team that's minimally competent. There is evidence in the record of that being an issue of incompetence. That's something Dr. Heath testified about in 2009. That's something that Justice French recognized in her dissent. And that these things hadn't changed. So even looking forward as you suggest, Judge Gibbons, Broome made the argument that nothing here in any material respect has changed to suggest that there would be any difference. In addition to that, the evidence... Well, wait a minute. Can I ask one more thing? I recall the evidence about Dr. Heath and what he said that could arguably lead to an inference that the personnel in charge with accessing the veins were just incompetent. But now, did the materials that you initially filed include the evidence about what methodology is used today? Well, yes. Well, today... When you say today, Your Honor, do you mean the protocol that was changed immediately after Broome? No, no. I mean not the protocol immediately after Broome. I mean the protocol under which he would now be executed. I guess he initially filed this proceeding before that change. Is that right? That's absolutely right. In fact, Your Honor, that change  did not happen against him. The Supreme Court of Ohio decided this case in March of 2016. It was in the fall of 2016 because Ron Phillips was going to be executed. I was his lawyer. They made that change in the fall of 2016 to go back to the three-drug method. And that was all that litigation about whether that was permissible given the promise that they would never do that ever again. We had all that litigation. This is Judge Moore. I'm a little bit confused. Is your position that the developing evidence about the methods of execution are relevant to the habeas case or are they claims that you would raise in the 1983 challenge to the lethal injection method as it exists when your client is about to be executed? I think my point with respect to those changes in the evidentiary record and how easy it is for the protocol to be changed is a point that goes to the question in habeas about whether the Supreme Court of Ohio, when it's looking at that evidence and making judgments about it against the client's claim, that in habeas, this allows that state court adjudication to be treated as something to which comedy and deference ought to be owed. It should not be owed. The Supreme Court of Ohio's decision should not be entitled to any deference for purposes of habeas. And that's why those facts, I think, are so critically important for the court to look at when it's trying to decide whether there's been this quote-unquote extreme malfunction in the state system. Let's assume for the moment that you do need to give deference that this was a merits decision. And isn't the fundamental problem then this Supreme Court decision and I don't know how to pronounce it, Restweber, which was from 1947 but seems to be the key Supreme Court precedent on the first attempt to execute someone failing and then the question whether a second attempt by the same general method can go forward? Let me answer that this way if I could, please. Our view, of course, is that Restweber is not the clearly established federal law and that TROP is. But if the court's position is or conclusion is that there is deference owed to the Ohio Supreme Court and that Restweber is the case that needs to be looked at, then we believe that Restweber was applied in an unreasonable way and the facts, again, were unreasonably determined. So you're back at the same place, which is that Broome is entitled to a de novo look at this. Because the thing about Restweber, it hinged on the point that this was viewed as an unforeseeable accident. And that's just not Broome's case by any stretch. I mean, Restweber, Willie Francis, that was a one-time thing where the electric chair malfunctioned one time. It was a couple of minute malfunction. That was it. There's no history of any prior problems. None of that was in that record. Here you've got a situation where Ohio had been struggling many times with IV access with guys trying to execute them. Joe Clark, for example. Joe Clark was 18 times, sort of like Broome. That was only a couple years before Broome. There was no backup plan in place after Joe Clark, even though it was obviously clear there were problems with IV access. So this unforeseeable accident is simply wrong. Restweber talks about that. That's not this case. There's also the situation here in Restweber. He talked about the infliction of unnecessary pain and whether there was unnecessary pain inflicted, and they didn't find that in at least the polarity in the Willie Francis case in 1947. But that's simply not true in Broome's case. I mean, the amount of pain to which Broome was subjected is striking compared to what Willie Francis suffered. He described what he suffered as a tickle. I thought that there was, excuse me, I thought in the Restweber case there was an indication that there was substantial pain. There's a footnote that goes into some detail on that. Well, maybe here's the point there on that, Your Honor. Perhaps there may have been a factual dispute. I think that was one of the questions that the dissenting justices I think were looking at is that he should have had an opportunity to go back and have a hearing on to determine if he even suffered any pain, if the electricity there ever even got to him. Because there is evidence in the record, at least in the Restweber case as I recall it, where he was quoted saying, you know, I felt a tickle. But you're right, there were some conflicting reports that his, you know, after when the electric chair switch was pulled, that the chair rocked, and I think that his eyes may have, you know, made some sort of response. So there was some conflicting evidence, and perhaps he did suffer some pain. But nonetheless, compared to Broome, which went on for two hours, you know, being left in that room by himself and then, you know, three or four different attempts being made on him, now this is a series, if nothing less, it's a series of abortive attempts on Broome because they tried three or four different, you know, efforts made. After they took a break, they go back, they take a break, they go back, ending up with 18, 19, 20 at least needle insertions on this guy. Under Restweber, does it make a difference that the drugs of execution were not attempted to be used in Broome's case, whereas in Restweber, the electricity, the current was set forth, and even if you take the position of the minimal that it was like a tickle, there was the use of the electric current there. Does that make a difference? No, I don't think that makes a difference at all. In fact, I think in Broome's case, the process started in both cases. For any reasonable assessment of when an execution starts in both of those cases, they started. In Broome's case, it most certainly started. They read the warrant, the videos started, the witnesses had been assembled, the solemn process began, he surrendered his body to the state. That's what he did. Director Collins said once it belongs to the state, it isn't stopping, and that's what he testified. I think of it like a ball being dropped from the top of a roof. They let go of the ball, and the only way it was going to stop is if somebody, the governor, stuck a net out before it hit the ground. That's what happened here. The governor stuck a net out before it hit the ground, but the process started, and the level of pain that was inflicted upon Rommel Broome compared to Restweber, or Willie Francis, is really strikingly different, which is why I think when you think about the Eighth Amendment and what it means today with the focus on dignity and how important that concept has become in Eighth Amendment law, which wasn't discussed or even addressed in Willie Francis' case, but the human dignity that now is so important, which is why Restweber case isn't a clearly established federal law. The law that's applicable to this type of a claim today is TROP and the cases that have come since then, which so clearly talk about dignity and avoiding punishments that even if not painful can nevertheless be psychologically cruel, or placing someone in fear of ever-increasing fear and distress, those types of punishments. It's striking as we look at Eighth Amendment law since the 1940s how important dignity is. Is there another case beyond TROP that you would refer to that you think is on point with this situation? Well, yes, Your Honor, I would. I really think there's a steady drumbeat of case law from the United States Supreme Court, which has consistently reaffirmed the importance of human dignity when we look at punishing fellow human beings. Estelle v. Gamble talks about dignity, the broad and idealistic concept of dignity, civilized standards, human decency, that case. Kennedy v. Louisiana in 2008 discusses that. Roper certainly discusses that. So then the question is, did the Gossip or Bayes refer to Reese Weber? Yes, I do believe they did refer to Reese Weber. But again, Your Honor, those are different cases. Those cases aren't asking the question about whether somebody who's already run the gauntlet should have to run it again. Those cases are asking whether someone who never has. That's the case Broome might have brought before he was executed. But the case Broome is bringing now, the case that Joe Clark could have brought had he not died, which is that you can't do this twice. Bayes and Gossip are cases brought by people who haven't run the gauntlet, who haven't suffered the pain of having gone through the process once. So this is Judge Batchelder. Would it be your position then that at the point that the medics who were attempting to insert the catheters took the first break, that at that point they couldn't proceed any farther ever? No, that's not my point. That wouldn't be my point, Your Honor. Why? There was already a lot of pain inflicted. Why is that different? Well, I guess I'm wondering about the first break. Here's my view of this case. Wherever the line is drawn, wherever it's drawn, Broome's case passed it. I recognize that it's hard to draw a line. So after you've made the first attempt to insert a needle and were not successful? Again, I think if you're trying to draw a line, I recognize that that can be difficult. But the Eighth Amendment speaks to dignity and human dignity and decency. And at some point we cross that line. And in Broome's case, we crossed it. I recognize that when you get to two or three or four, because that's what happened to Alva Campbell. Remember Alva Campbell? He's the guy that Ohio tried to execute in 2017 who had all these different medical conditions and they were unable to get access after I think the record, or at least the press reports, this is in one of our footnotes, maybe three or four attempts. And the state stopped then. If nothing else, it shows that the standard of decency has gone to the point where they'll stop at three or four. But nonetheless, wherever that line is, Your Honor, and I recognize that those issues of where the line is can sometimes be difficult when you're at that early stage. But in Broome's case, they passed it by any stretch. And certainly by the time they're bringing in a doctor that doesn't even belong on the team, they're summoning someone who, this poor woman, Dr. Bautista, who is a contract physician working at the Southern Ohio Correctional Facility for a few months. She didn't even know what the death house was used for. She wasn't on the execution team. They call her over by the warden, her boss. So she comes over and she's inserted into the process. This became a lawless process. At some point, it passed whatever the line is with respect to human dignity. I see that your time has expired. I think you wanted to have five minutes left for rebuttal. If you want to close now or use your rebuttal time, whichever you prefer. Thank you for alerting me to that, Your Honor. I would like to just close by saying this. You had asked about which cases, and I think there's a number. And I think a number, the other point to make with respect to that is that you can have two or more principles from the Supreme Court case law and you can apply it together to dictate the result. And here you have that. You have TROP and you have all these other cases. This line of dignity that I think is so, so important in Eighth Amendment law. I'll reserve the rest of my time. Thank you. Mr. Willie, are you there? Yes. Thank you. May it please the Court, this is Charles L. Willie, Ohio Assistant Attorney General, arguing on behalf of the Warden. Your Honors, the question presented here, as I would think in most habeas cases, is that whether the Ohio Supreme Court's denial of Mr. Broome's claims that the failed execution attempt gave rise to violations of his rights under the Eighth Amendment and the Double Jeopardy Clause, whether the Ohio Supreme Court clearly established law in rejecting those claims. Now, the Warden's position here is pretty straightforward. Only one instance in which the U.S. Supreme Court has addressed this type of failed execution scenario, and that is the Reese Waiver case. And in that case, the Supreme Court rejected the claims. Now, it's important here to consider that Reese Waiver has been construed and actually has been applied recently, fairly recently, by the Supreme Court and this Court in what we've commonly referred to as the Supreme Court. And that is why, I think that is because of this. Your Honors, the two issues are related in the sense that Reese Waiver has been seen as establishing that the unintentional failure to carry out an execution is not cruel and unusual punishment and does not involve the type of cruelty and pain that is prohibited by the Eighth Amendment. This is related, of course, to the idea as to whether an execution presents a risk of constitutionally prohibited pain. That is why in the Bayes case, the plurality opinion referenced Reese Waiver for standing for the proposition that a failed execution attempt is not a violation of the Eighth Amendment if it's unintentional. And likewise, it shows that the type of risk that is prohibited by the Eighth Amendment goes beyond the risk that there might be a failed execution attempt, which would result in pain. Now, that has been the way Reese Waiver has been applied, and it makes sense. Mr. Sweeney's position seems to be this, that we can divide neatly and conceptually and neatly the issue of whether the attempt to execute him itself violated the Eighth Amendment and whether a future attempt would do so. But that really can't be done, and to look at that, you can just go right to Mr. Sweeney's brief at the Ohio Supreme Court. Judge Moore, we just lost Judge Gibbons. Okay. If you would hold up, Mr. Rilley, and we'll get Judge Gibbons back. Just hold on. Yes. Yes, I will. Thank you. Judge Moore, Judge Gibbons is back on the line. Okay, and I see the dispatch holder and the two lawyers. Is that right? I'm here. Yes, this is Mr. Rilley. I'm here. Okay, great. Mr. Rilley, if you would feel free to begin where you think appropriate, then. Thank you. Yes, to reiterate, the issue as to whether the failed attempt to execute Mr. Broome violated his rights under the Eighth Amendment is related to whether a future attempt would do so. Those things are inextricably linked and have been linked by the Supreme Court insofar as it's been recognized that in a normal case, you're talking about a risk of unconstitutional pain, and that's the type of issue that's presented. Don't think that you can just separate conceptually the two questions. Mr. Sweeney in his brief on direct appeal recognized that. He said not only that the attempt to execute Mr. Broome violated his rights under the Eighth Amendment, but also any future attempt under any method, under any future protocol would likewise do so. Essentially, what Mr. Sweeney did was he put in issue the any future attempt. Not only did he put it in issue, but it inevitably is an issue as to whether a future attempt would present a constitutionally prohibited risk. Excuse me, this is Judge Moore. Are you saying then that the answer to whether it would be cruel and unusual punishment to try to execute Mr. Broome again depends on what method is going to be used in the future? I'm saying this, Your Honor, that the issues are related and inextricably linked because, again, the normal type of execution claim involves  So then shouldn't there have been an evidentiary hearing about what kind of methods would be used in the future to decide whether a second attempt to execute would be a violation of cruel and unusual punishment in light of the first failed attempt? Two responses, Your Honor. First, as the Ohio Supreme Court found and the Ohio Supreme Court found, while Mr. Broome argued that any future attempt would be unconstitutional as well, he did not ask for discovery explicitly at the trial court. Incidentally, Mr. Broome put in lots and lots of evidence in the form of documents and so forth that was generated by the litigation concerning federal litigation concerning Ohio's execution procedures. But importantly, the Ohio Supreme Court found that Mr. Broome did not ask the trial court explicitly to lay out what additional information or discovery he needed and also he did not set forth to the Ohio Supreme Court what an evidentiary hearing would have produced in terms of evidence that was not before the court. And I think, Your Honor, that's not the fault, Mr. Sweeney. The fault here is that again, this case, as he's pointed out, really is different in the sense that it does involve the failed execution attempt. So it's not as straightforward, well, the procedures that are going to be used to enforce the Constitution. But those things are interrelated, as I said before, because in the end, those things are related because they relate to the whole idea. The core issue, the core holding of, if you would, or at least what's been attributed to stand for in Race Waiver, is unfortunate things happen. These things can happen, but there's no intent to inflict cruel and unusual punishment and the type of pain that is experienced is not the type, really, of pain if you will, as the Supreme Court recently said in Bucklew, it's not the type of super added pain that falls within the Eighth Amendment Prohibition. However unfortunate this was, puncturing Mr. Broome's veins was a necessary incident of conducting lethal injection. In no way suggests, there's no suggestion here or logical reason to say here that this was any kind of super added pain or any kind of pain that really kind of crossed, if you could say crossed, that fundamental prohibition against cruel and unusual punishment and also it's consistent with, as this Court has said as well in the Cooey v. Strickland case. Suppose that instead of two hours and 18 punctures, the state had decided to go ahead with 24 hours of a round of people attempting to access a vein. Would that then be a different case where under Race Weber there would be cruel and unusual punishment to try to execute again? Your Honor, I would say, I have to say that given Justice Frankfurter's concurrence, he did leave open the possibility. I can't remember his exact words but he left open the possibility that you could have such repeated instances in the nature of what occurred in Race Weber that it could rise to a level of a constitutional violation. But in that regard, I think it's also important to note that difficulties in accessing veins is a risk that is incident in lethal injection. It's been well known as a matter of fact, way back in 1984 it was recognized in the Heckler v. Cheney case that lethal injection does involve the possibilities of difficulties in accessing veins. But what's important here is the record shows that Ohio has done many, many things to assess that risk. Ohio has done much, many of the changes, the safeguards that were implemented in Ohio's execution procedures were designed to prevent that type of occurrence. And in fact, we had unfortunately, in Mr. Broome's situation those safeguards, or after that, more safeguards were implemented, thought to be necessary. But again, this shows that Ohio does not in any way resonate with an intentional or super added pain. Now, Mr. Sweeney brought up the case of Mr. Campbell. In that instance, the state recognized that due to his medical condition, they could have difficulties accessing his veins. And after the attempts were made, a decision was very quickly made to halt the execution. Now, that's two incidents in many executions of lethal injection. And that's a risk that could happen, but it's been two for Ohio in many, many years. What about the Clark case? How do you deal with that? In Clark, if you recall, what happened is that that was the first time that it was recognized that more safeguards were needed. After Clark, those safeguards included more detailed instructions to the execution team members. While Clark was occurring, the court had the issue before it as to what the statute of limitations was for these types of claims. You can see the court was aware that, yes, there were difficulties, but the court noted that additional safeguards had been put in place. As we go forward, in experience, as time went on, additional safeguards were put into place, additional safeguards to address this. Now, Mr. Swinney has also said, but what about the Supreme Court of Ohio's citation of those other executions? I would submit, Your Honors, that in these types of cases, it is not unusual for the courts to look to the executions and other cases, if you will, the execution track record as reflected in judicial decisions in assessing claims under the method of execution claims under the Eighth Amendment. In Bays itself, recall, I thought it was startling myself that some of the justices said, this isn't going to solve anything. I mean, this isn't going to solve anything because a new record comes along, new evidence, it could be a different result. But the Chief Justice was very much concerned to address that and said, no, we're going to establish a standard here. We've thoroughly reviewed this. And we know that courts will look to our decision here, and they'll look to procedures which we have said were constitutionally valid. No one would suggest that in doing so, an appellate court in another state would somehow be going beyond the evidence of record and deciding the case in a way that should not, they have to ignore those cases and those executions. In the Glossip case, an amicus was filed in which numerous evidence, I won't call it evidence, but there was much, much information to the extent as to how many times that particular execution protocol issue was utilized and was found to be adequate by the courts. And in deciding the case in Glossip, the court itself distinguished Glossip from some of the incidents in those other cases. No suggestion there that the Supreme Court had gone beyond the evidence or had done something wrong. Again, it's the nature of these types of claims. Recently, in the Butlew case, Justice Gorsuch's opinion was based very much on his assessment as to the pain that was caused by execution by hanging. And he made the comparison there, and there was no suggestion that somehow there was evidence presented in the case as to how we would compare the execution pain produced by hanging versus the type of pain that was at issue in that case. I don't want to downplay the what happened to Mr. Broom was unfortunate, and he did suffer pain. I mean, there's no question he did. But when it comes down to the type of pain that's prohibited by the Eighth Amendment, we have a Supreme Court holding that says, at least it's been construed to say, that pain that might be caused by an unsuccessful execution attempt, not only the pain by the electricity, but the psychological pain, which Mr. Francis argued, the psychological pain that he was to face in another execution. We have the court saying, that is not unconstitutional because it was unintentional and because it didn't rise to the level of cruel and unusual punishment that would be prohibited by the Constitution. That's what we have. Now, the Ohio Supreme Court applied that precedent, and we would submit how they applied it, did not contravene it, was consistent with that case. To really come right down to it, in order to find something to see, as Mr. Sweeney says, Mr. Sweeney says, that's really kind of outdated. In order to find that in habeas corpus, one would be required to extend other cases like Trope and Estelle v. McGuire, extend those more general principles to the distinct factual circumstance that's presented here, the unique factual circumstance. We think it's well done, but in order to find that in habeas corpus, that's something that just can't be done. You cannot take those general principles and apply them to a distinct factual circumstance for the first time. Ultimately, the case comes down to simply that. Whatever occurred to Mr. Broom, it was something that should resonate and has resonated. The long and short of it is that the Ohio Supreme Court did not contravene, misapply, contravene the standards set forth by the Supreme Court of the United States in rejecting his claims. The court has no further questions. We would ask that the court affirm the judgment of the district court. I have a question. This is Judge Batchelder. You talked about the Eighth Amendment, but did you have anything you wanted to add to your brief on the subject of the Double Jeopardy Clause? Again, what it really comes down to is that the Double Jeopardy Clause we have this Reese Waiver saying that the Double Jeopardy Clause did not apply, at least in part, because there was no cruel and unusual pain. This was, again, an unintentional occurrence. It was not an intentional attempt to inflict additional cruel and unusual pain. Again, that does relate to the Double Jeopardy Clause. It does relate because, as Justice Frankfurter said in concurring, well, conceivably repeated deliberate attempts. I mean, I took that to mean something in the nature of deliberately bringing a person to the edge of execution, stopping and then bringing them back, akin to some of the tactics that have been used over the years, put somebody in front of a firing squad, the guns click, bring them back the next day, do it again. I think that's what was being referred to there. Now, Mr. Sweeney has pointed out that Double Jeopardy jurisprudence has advanced, and it has. Nevertheless, it's never been applied to this particular factual situation other than Reese's Waiver. Again, that is a telling point in federal habeas corpus. As a matter of fact, it would seem to be at least debatable whether Double Jeopardy would be seen to be even applicable now in this unusual situation. That might be a reasonable debate because after all, Mr. Broome was not punished twice. No one can be executed twice. So the punishment that he received is death and he has not received that punishment. But I think Double Jeopardy clause here, again, that argument, I think, really is intertwined with Reese's Waiver and the deferential standard of review. Thank you. Thank you very much. Mr. Sweeney? Thank you, Your Honor. Let me just briefly address that Double Jeopardy argument. Here's the thing that I think, and I think this theme runs through both the Eighth and the Fifth Amendment arguments, which is that there are certain fundamental principles of constitutional law that when new facts come up, their application to those new situations are going to be obvious. And I think that's true for both the Eighth Amendment claim Mr. Broome is raising and the Fifth Amendment claim he's raising. In the context of the Double Jeopardy clause, boy, I tell you, I think Judge Clay was right when he says if the plain language of a constitutional provision isn't clearly established, then nothing is. You know, the plain language of a provision that isn't clearly established federal law, nothing is. And this notion of multiple punishments in the context of capital cases, next party lang, going back into the 1870s, it seems to us made that very clear. And so when Reese Weber came up in our history when the Fifth Amendment didn't even apply to the states, nonetheless the court said it's clearly implicated. Our minds rebel. And there's no question in their minds that it's implicated. So at some point it's going to have to be violated if it's implicated. The notion that it can never be violated because you can never die twice just can't be right. It's implicated in the context of capital punishment. It is. That's clear from the plain language. It's clear from Reese Weber. And then so when the underpinnings of Reese Weber get swept away in 1969 with Denton v. Maryland, I think we're in that very situation where certain principles are so fundamental that when they arise you know they apply. When you see it you know it. This is one of those. The double jeopardy claim here we think is an easy claim. So when does jeopardy attach in this context of an attempted execution? That's an issue of federal law, Your Honor, which is why the state decision isn't entitled any deference. It attaches at the very least once he surrenders his body to the executioners and they begin to execute him by inflicting the pain which is what they did here. And wherever that line is it's crossed here because of how long it went on. Now this went on for two hours with three I think you could say three maybe four separate attempts with the breaks. Now the first attempt was 10 or 15 minutes and then a break and then another I think there was another I think one person took a break and then the second attempt would have been with different people and then they took a big break and then there was the third attempt and then there was the attempt with the doctor. So there's like four different attempts. Wherever the line is for jeopardy's attachment it was crossed here. And that's an issue of federal law. This is a once in a half century type of claim. Principles of the double jeopardy clause that we identified in our brief I think are clearly established. They can arise from two different Supreme Court cases which then are applied together. Palco was the underpinning of Reese Weber's rejection of the double jeopardy claim but Palco now is no longer good law. The notion that you can try twice to attempt to obtain a death sentence that was okay in the 40s but after then you cannot no longer you can no longer try twice to get a death sentence. And so that was what the Reese Weber court relied on. That rationale for analyzing the question of whether you can attempt to carry out the sentence twice. It seems like such an easy logical not an extension but an application of the notion that Reese Weber was under its analysis was undercut once Palco was overruled in Benton. So I think the double jeopardy claim is a sound claim on which he's entitled to relief. My point here to make in rebuttal and I think it's important to remember no court has given Mr. Broom a hearing. So when you talk about future attempts and if that's part of what has to be shown well then he should have been given an opportunity to have a hearing and to be able to meet whatever burden the state courts say he's required to meet. He never had that opportunity here which as I mentioned is why we ended up with such splintered state court decisions 4-3 and 2-1 with dissenting justices and judges recognizing how unfair it is not to give him a chance to try to prove his case with the kinds of things that he begins to do to prove cases, presenting evidence. Broom's case he did make both arguments both times that the first attempt was an unconstitutional situation and violated his rights under the Eighth Amendment but even if it isn't a second attempt would be. He made those arguments. He's always made those arguments. That's always been his constant approach to this case from the beginning. When he first filed his post-conviction petition in the state trial court in 2010 he just never had an opportunity to prove any of that because he was never given a hearing. Never given discovery, never given a hearing. The state trial court denied it without any kind of hearing or anything like that. Just denied it with a several page entry and then it went up to the appellate process that we've already discussed. Mr. Willie talks about this not being enough pain or he suffered some pain but it's not sufficient pain. But again he's making the same mistake the Ohio Supreme Court made and the other courts have made which is they skip dignity. It's not enough to just say what's the level of pain. He also has to say under the Eighth Amendment what about the human dignity aspect of this. That's again the notion of where you have fundamental constitutional principles. They may come from two or more Supreme Court cases but you apply them together and those principles say it's not just pain, it's also dignity. What about the offense to his human dignity? What about that? What about the trauma that we now know based upon more modern conceptions, the impact of trauma on human beings and how it affects people. That's something they didn't know in the 40s. These are all things that are relevant, that are now pertinent under constitutional principles that are prevalent in the 21st century that may not and were not prevalent in the middle of the 20th when the Reese Weber case was decided. That's the real problem here with this case is looking back to such archaic and precedent that in many respects it is no longer appropriate to be followed for this particular type of thing. Justice O'Neill, William O'Neill when he dissented in the Ohio Supreme Court he said it best when the question was asked, would the second attempt constitute cruel and unusual punishment? He said yes, clearly it would. He said the hold otherwise based upon Reese Weber is resting the decision entirely on a discredited theory of the Constitution. That is just so obviously true here based upon what we know now after TROP and after this steady stream of U.S. Supreme Court cases that reaffirm constantly reemphasize the importance of human dignity. These are not abstract principles that have a high level of generality. These are four fundamental Eighth Amendment values that our Constitution stands for and in Burns' case they were violated. Your time I'm afraid has expired. It's hard when you don't have the light system that we have visually in Cincinnati, but I think both of you have made your case and unless any of the judges have any further questions for Mr. Sweeney I think the case is submitted. Do either of the judges have any other questions? I do not. No. No. Well we thank both of you for today and the case will be submitted and we will issue a decision in due court.